NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0119n.06

No. 22-2151

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | FILED<br>Mar 13, 2024<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| ADARIUS FERGUSON, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |
| | ) | |

Before: BATCHELDER, CLAY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Adarius Ferguson oversaw a sprawling criminal conspiracy in which he and his co-conspirators stole, sometimes sold, and other times returned for cash various electronics and other items from Walmart stores throughout the United States. Part of the evidence compiled against him included items discovered during searches attendant to traffic stops of vehicles that Ferguson rented in April 2020 and March 2021. Ferguson sought to suppress the evidence obtained during these searches, asserting that the searches violated the Fourth Amendment. After his motion to suppress failed, Ferguson pleaded guilty to one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1349 and 1343. Ferguson's plea agreement reserved his right to appeal the district court's denial of his motion to suppress. The district court sentenced Ferguson to 144 months in custody, three years of supervised release, restitution in the amount of $295,444.70, and a $100.00 special assessment. Contending that the

district court erred in denying his motion to suppress and imposed an unreasonable sentence, Ferguson timely appealed.

For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

*April 18, 2020, Traffic Stop.* On April 18, 2020, at approximately 1:00 am, Michigan State Police ("MSP") Troopers Garry Guild and Zachary Dorr stopped a Buick Enclave with a Florida license plate for making four consecutive turns without signaling before pulling into a private driveway in Benton Harbor, Michigan. Once stopped, both front-seat occupants—Ricardo Melhado, the driver, and Christopher Campbell, the front seat passenger—attempted to exit the vehicle. Campbell quickly hopped out and began walking toward the officers, but Melhado had pulled too close to a fence on his side and could not open the door wide enough to get out. Though Melhado initially refused to give the officers his full name and had no driver's license on him, he eventually showed them a picture of his Ohio driver's license that he had saved on his cell phone. Campbell had no identification on him, but gave his name and address, which matched the house into whose driveway they had come to a stop. After about 11 minutes, the troopers determined that Melhado's driver's license was suspended. Tpr. Guild also discovered that the vehicle was rented. Melhado claimed he was authorized to drive the vehicle but neither he nor Campbell were able to produce the rental documents.

During the course of the stop, the troopers observed totes and boxes of electronics stacked from floor to ceiling inside the vehicle. When the troopers asked Campbell about the electronics, he denied any knowledge about them and told the troopers to speak to his uncle, whom he identified as Ferguson. Campbell called Ferguson on the telephone and when Campbell relayed

that Tpr. Guild had asked him about the electronics, Ferguson responded that the trooper was "asking too many personal questions." Ferguson then indicated that he was heading to the scene with the rental agreement. But regardless of whether the paperwork might show that Melhado was listed as an authorized driver, the troopers had verified that Melhado was driving the rental vehicle on a suspended driver's license—a misdemeanor in Michigan—which meant that Melhado could not legally drive any vehicle in the state. And about fifteen minutes into the traffic stop, Tpr. Guild decided—pursuant to his understanding of MSP policy—to tow the Enclave. Nevertheless, the troopers held off on calling for a tow truck until they could review the rental paperwork that Ferguson offered to bring to the scene.

About twenty-five minutes into the traffic stop, Ferguson arrived at the scene driving another rental car, a Yukon Denali. Ferguson first accidentally handed Tpr. Guild the Denali rental paperwork before correcting himself and producing the Enclave paperwork. Both documents showed that Ferguson was the only authorized driver for both vehicles.

When asked about the electronics, Ferguson provided Tpr. Guild paper receipts for the merchandise that showed a series of cash purchases in similar or exact same amounts from various Walmart stores in Missouri. He explained that he would purchase electronics from Walmart stores outside of Michigan, then resell them for profit. But Ferguson's explanation about his electronics purchases and plans for reselling them "ma[d]e no sense business-wise" to the troopers and fed their suspicions that "something was amiss." (R. 248-3, PageID 1493 (Gov't Ex. 2) (00:31:48); R. 248-2 (Gov't Ex. 1); R. 330, Evid. Hr'g Tr., PageID 2837).

Thirty minutes into the stop, Tpr. Guild reaffirmed his decision to tow the Enclave. However, Tprs. Guild and Dorr then began discussing an interest in searching the vehicle to document the electronics. Notably, the troopers expressed hesitancy about towing the car because

they might need a search warrant "for everything in the car." (R. 248-3, PageID 1493 (Gov't Ex. 2) (00:31:48–00:36:30)).

Nevertheless, about 50 minutes into the stop, the troopers notified the men of their decision to tow and search the car. They allowed the occupants to remove their personal items from the vehicle. As Campbell began removing his personal items from the vehicle, the troopers observed a brand-new Iowa license plate on the floor by the passenger seat in their plain view. Tpr. Dorr ran the Iowa plate and found that it was registered to a different car, which, in his experience, suggested criminal activity.

The officers initiated an inventory search of the vehicle at the scene. However, due to safety concerns, they decided to complete the inventory of the vehicle at the tow yard. Tprs. Guild and Dorr documented over $30,000 worth of electronics from the inventory search.

***March 28, 2021, Traffic Stop.*** The FBI opened its investigation of the retail fraud scheme in late July 2020 after the April 2020 traffic stop. FBI Special Agent Ben Glynn ("SA Glynn") testified that agents used the identifying information that Ferguson had given the MSP troopers during the April 2020 stop of the Enclave to gather information about Ferguson's retail fraud scheme from over eighty police reports across the country. The FBI then coordinated with Walmart, which had been investigating Ferguson's retail fraud for years, and subpoenaed rental car companies to identify cars rented to Ferguson and his girlfriend before and after the April 2020 stop.

On October 26, 2020, and March 18, 2021, the FBI obtained cell phone location warrants for one of Ferguson's cell phones. The location data obtained from the March 2021 search warrant showed Ferguson's phone in the vicinity of two Walmart stores in Pennsylvania and West Virginia,

where Walmart had reported to FBI incidents of theft and fraudulent returns. The data then showed Ferguson's phone returning to Michigan on March 28, 2021.

When Ferguson returned to Michigan, the FBI requested assistance from local law enforcement in surveilling Ferguson's vehicle, a blue 2020 Chrysler Pacifica, also identified in the Walmart surveillance videos. Now back in Benton Harbor and traveling on the highway, SA Glynn watched the van fail to maintain its lane. Detective Jessica Frucci ("Det. Frucci") from the Berrien County Sheriff's Office, who had been briefed on the details of the investigation, also saw the van change lanes twice without signaling.

Det. Frucci called out the lane violations over the radio. MSP Trooper Aaron Adams ("Tpr. Adams"), also briefed on the details of the retail fraud investigation, heard the call, and pulled Ferguson over in a marked patrol car. Tpr. Adams ran Ferguson's information and learned that he had an officer-safety restriction and other restrictions on his driver's license. Tpr. Adams also observed several boxes of electronics in the back of the van in plain view.

Soon after the stop, SA Glynn and an FBI task force officer arrived at the scene. They detained Ferguson, searched the van, and found a stolen Walmart vest, Walmart name tag, keys for retail anti-theft devices, and the security key referenced in the Walmart theft reports days earlier. They also found boxes and tubs of electronics with altered receipts from three different Walmart stores in Virginia dated March 27, 2021.

### B. Procedural History

Ferguson was indicted by a federal grand jury on May 4, 2021, for Conspiracy to Commit Interstate Transportation and Possession of Stolen Goods, in violation of 18 U.S.C. §§ 371, 2314, and 2315; Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349 and 1343; Possession of Stolen Goods After Interstate Transport, in violation of 18 U.S.C. §§ 2315 and 2;

and five counts of Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2. Ferguson moved to suppress the evidence and information obtained from the April 2020 and March 2021 searches, arguing that the 2020 inventory search was a pretext for an illegal search; officers lacked probable cause for the 2020 search and for the 2021 stop; and the evidence collected during the 2021 stop should be excluded as fruit from the poisonous tree because it derived from evidence gathered during the 2020 search.

The district court held a hearing on the motion over the course of two days, which included testimony from Tprs. Guild, Dorr, and Adams, SA Glynn, and Det. Frucci. At the end of the hearing, the district court denied Ferguson's motion to suppress on the record and entered an order dated July 13, 2022. Subsequently, the parties entered into a plea agreement and Ferguson entered his guilty plea on July 27, 2022. Ferguson conditionally pleaded guilty to Count 2 of the Indictment, Conspiracy to Commit Wire Fraud, reserving his right to appeal the district court's denial of his motion.

At sentencing, the district court sustained Ferguson's objection to the probation officer's recommendation to deny him Guidelines credit for acceptance of responsibility. He, therefore, received a three-point reduction in his Guidelines calculations to reflect acceptance. This was partially offset, however, by the court's decision to grant the government's motion for an upward variance. The court varied upward by two levels, determining that a range of 100 to 125 months was appropriate and sentenced Ferguson to 144 months' custody, 3 years' supervised release, restitution of $295,444.70, and a $100.00 special assessment. Ferguson timely appealed.

On appeal, Ferguson maintains that the district court erred in denying his motion to suppress because the April 18, 2020, and March 28, 2021, traffic stops constituted unlawful

searches and seizures under the Fourth Amendment and that the district court's application of a 2-level upward variance was substantively unreasonable. We address each argument in turn.

## II. Standard of Review

When considering the denial of a motion to suppress evidence, "we review the district court's factual findings under the clear-error standard and its legal conclusions de novo." *United States v. Snoddy*, 976 F.3d 630, 633 (6th Cir. 2020) (quoting *United States v. Hockenberry*, 730 F.3d 645, 657 (6th Cir. 2013) (internal quotations omitted). A finding is clearly erroneous "only if the record as a whole leaves the reviewing court with the definite and firm conviction that a mistake has been committed." *Id*. (quoting *Kerman v. Commissioner*, 713 F.3d 849, 867 (6th Cir. 2013)). Under this standard, this court considers the evidence in "the light most favorable to the government." *Id*. (quoting *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013)).

A district court's "after-the-fact conclusion" that probable cause existed is "a legal determination that an appellate court reviews de novo," *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023) (citing *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018)), without deference to the court below, *id*. (quoting *United States v. Brown*, 732 F.3d 569, 572–73 (6th Cir. 2013)).

## III. Analysis

*April 18, 2020, Traffic Stop*. Ferguson first maintains that the April 2020 stop was unjustifiably prolonged and the subsequent warrantless search of the Buick Enclave was unconstitutional. Traffic stops are governed by the Fourth Amendment's protection "against unreasonable searches and seizures." U.S. Const. amend. IV; *see United States v. Jones*, 565 U.S. 400, 404 (2012). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful

interference with an individual's possessory interests in that property." *United States v. Elmore*, 304 F.3d 557, 560 (6th Cir. 2002) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Accordingly, a traffic stop is considered a seizure of everyone in the vehicle, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and its reasonableness turns on the basis of the stop and its duration, *see United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) ("The pivotal issue is whether, under these circumstances, the scope and duration of the detention transformed this legal traffic stop into an unconstitutional seizure."). Because Fourth Amendment rights are "personal rights," they "may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citations omitted). Here, the troopers did not violate Ferguson's Fourth Amendment rights, despite his status as the renter of the Enclave, because he was not driving or riding in the vehicle at the time of the stop. In other words, he was not personally stopped or seized, so he lacks standing to challenge the seizure of the vehicle. *See Prouse*, 440 U.S. at 653 (holding that a traffic stop is considered a seizure of the *occupants* of a vehicle); *see also Elmore*, 304 F.3d at 561 (holding that a vehicle owner not present in the vehicle when it was stopped could not show interference with his possessory interest in the car and thus, could not challenge the constitutionality of the stop).

While Ferguson may be foreclosed from challenging the fact and length of the seizure, the parties do not dispute his standing to question the search, and we are not required to resolve this issue before addressing the merits of Ferguson's Fourth Amendment claim.[1] *See Byrd v. United*

---

[1] As the authorized renter of the Enclave, Ferguson had a proprietary interest in the vehicle. *See Byrd v. United States*, 584 U.S. 395, 405 (2018) ("one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude . . . .") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978)), *see also id*. at 405 ("The Court sees no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it . . . ."). But it is unclear whether this proprietary interest alone suffices to confer a legitimate expectation of privacy in the vehicle where a defendant is not present for the traffic stop. *See United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (declining to adopt a

*States*, 584 U.S. 395, 411 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.").

Generally, warrantless searches of vehicles "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotations omitted). One such "well-defined exception" is the inventory search. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996). Importantly, however, an inventory search is permissible only if the vehicle has been lawfully seized and impounded. *See Snoddy*, 976 F.3d at 633 (quoting *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012)). In that regard, an officer's decision to impound a vehicle must be made "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id*. (quoting *Jackson*, 682 F.3d at 454). Regardless of an officer's subjective intent, impoundment decisions are consistent with the Fourth Amendment so long as they are objectively justifiable. *See United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001). The standard criteria requirement for impoundment need not be detailed or contained in a written policy. *See United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007) ("Whether a police department maintains a written policy is not determinative, where testimony establishes the existence and contours of the

---

bright-line test and affirming the legitimate expectation of privacy must be reasonable in light of all the surrounding circumstances). Nevertheless, this Court does not need to resolve this issue in the present instance. *See Byrd*, 584 U.S. at 407.

policy."). Nor does it matter that alternatives to impoundment exist. *Hockenberry*, 730 F.3d at 658 (citing *Kimes*, 246 F.3d at 805).

In *Hockenberry*, we held that an officer's decision to impound a vehicle was reasonable where no one in the car had the authorization to drive it and leaving the car parked on the public street where it had been pulled over left it at risk of being vandalized. *Id.* at 660. The panel reasoned that the officers acted within their discretion to tow the vehicle and "were not required to allow [the] Defendants an alternative method of securing the vehicle." *Id.*

Relatedly, as earlier noted, the decision to initiate an inventory search "must be conducted 'according to standard police procedures.'" *Id.* at 659 (quoting *Smith*, 510 F.3d at 651); *see also United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (stating that the inventory exception applies only when officers follow "'standardized criteria' or 'established routine' governing the scope of the inventory searches'") (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). If "the evidence establishes that the 'police acted in bad faith or for the sole purpose of investigation,'" the inventory search is unconstitutional. *Snoddy*, 976 F.3d at 634 (quoting *Hockenberry*, 730 F.3d at 659). In other words, officers "cannot hide an investigative search under the pretext of an inventory search." *Id.*; s*ee also South Dakota v. Opperman*, 428 U.S. 364, 375–76 (1976). Yet, "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Snoddy*, 976 F.3d at 634 (quoting *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007)).

Indeed, we have upheld the constitutionality of a search despite some signs of pretext where the search was objectively justifiable. For instance, in *Hockenberry*, "some" evidence of pretext came in the form of the officers' questioning the defendant about whether contraband was in the vehicle and failing to inventory every item that they seized from the car. 730 F.3d at 660–661.

Similarly, in *Snoddy*, a trooper's repeated unsuccessful requests for the defendant's consent to search his vehicle, his declaration that he would find drugs in spite of the defendant's denial of consent if he conducted an inventory search, and his failure to "call in the tow truck until after seeking consent from [defendant] to search the car" did not invalidate the inventory search. 976 F.3d at 635. Like *Hockenberry*, "some of the evidence call[ed] into question whether the inventory search was pretextual," *id* at 636 (quoting *Hockenberry*, 730 F.3d at 660–61), but it was not enough to leave this court with a "definite and firm conviction that the district court erred in finding that the inventory search was objectively justifiable," *id*.

The same is true here. During the suppression hearing, Tpr. Guild and Tpr. Dorr outlined MSP's Official Order 17, which memorializes the "standard criteria" for impounding rental cars when operated by unauthorized drivers, effective at the time of the April 18, 2020, stop. According to the troopers, MSP's standard practice when a rental car is involved is to attempt to contact the relevant rental company—here Avis Car Rental—and either transfer the vehicle to a towing company to be impounded or release it to an authorized renter. If the troopers opt to tow and impound, MPS's practice requires them to conduct an inventory search to document the vehicle's contents. Though the officers testified about a prior version of the policy not found in the record,[2] MSP's standard criteria does not need to be "detailed" or within a "written policy" and the district court did not clearly err in crediting the troopers' testimony about the contours of the policy. *See Tackett*, 486 F.3d at 233 ("Whether a police department maintains a written policy is not determinative, where testimony establishes the existence and contours of the policy."); *United States v. Lumpkin*, 159 F.3d 983, 987–88 (6th Cir. 1998).

---

[2] Tpr. Guild testified that MSP issued an updated policy on impoundment decision making on April 21, 2020—the day after the Enclave was stopped.

Given MSP's policy, the troopers' decision to impound Ferguson's rental car was reasonable under the circumstances. No one disputes that the troopers stopped the vehicle for legitimate traffic violations. Melhado was driving the vehicle on a suspended license and while a background check confirmed Campbell's identity, he had no identifying documents on him. After learning these facts, the troopers had the discretion to impound the vehicle. *See Snoddy*, 976 F.3d at 634. MSP policy directed the troopers to attempt to contact Avis and either tow the vehicle or release it back to an authorized renter. Because of the late hour, the troopers did not contact Avis. And with no authorized driver to whom to return the vehicle, the troopers decided to impound the vehicle per MSP's policy. Although the vehicle was parked at Campbell's house and not on a "public street," *Hockenberry*, 730 F.3d at 660, the troopers were not required to provide Melhado and Campbell an "alternative method of securing the vehicle," *id*. Thus, considering these factors, the troopers acted "within their discretion" to tow the vehicle. *Id*.

The troopers decided to tow before Ferguson arrived and his later arrival at the scene did not make the troopers' decision to tow less reasonable. When Ferguson's rental paperwork confirmed Melhado was not authorized to drive, the troopers reaffirmed their decision to impound and called the tow company. While the troopers could have released custody of the vehicle to Ferguson after he presented valid authorization for himself, their decision to impound the vehicle was not impermissible just because this "alternative[] to impoundment . . . exist[ed]." *Id*. at 658. Furthermore, Ferguson was the only authorized driver for both rental vehicles and the troopers were under no obligation to ascertain how he proposed to take possession of them simultaneously.

Turning then to the inventory search, the troopers' decision to conduct an inventory search of the vehicle did not constitute pretext. The troopers lawfully stopped the vehicle and made a "reasonable decision" to impound it. *See id.* at 660. Once impounded, MSP's policy dictated that

the troopers conduct an inventory search. True, like *Hockenberry* and *Snoddy*, some evidence here "calls into question" whether the inventory search was pretextual. *Id.* For instance, several times during the stop, the officers discussed their suspicions about the electronics and their desire to search the vehicle. At one point, Tpr. Dorr even suggested that the purpose of the impoundment and inventory search was to avoid needing a search warrant. Further, the record suggests that the troopers did not inventory all the items within the vehicle. (R. 330, Evid. Hr'g Tr., PageID 2793, 2882 (allowing Melhado and Campbell to remove their personal items)).

Nevertheless, the district court did not err in denying the motions to suppress. The "problem" for Ferguson, like the defendant in *Snoddy*, is that regardless of the troopers' "motivations and beliefs," the record suggests the troopers were going to have the car towed "no matter what," consistent with MSP policy. 976 F.3d at 635; (R. 330, Evid. Hr'g Tr., PageID 2823). The fact that a trooper suspected that "contraband" might be found in the rental car did not invalidate the "otherwise proper inventory search." *Hockenberry*, 730 F.3d at 659 (quoting *Smith*, 510 F.3d at 651). As the district court recognized, Tpr. Guild's statements at the scene and his testimony at the evidentiary hearing "honestly display[ed] what he was talking about" concerning the electronics, "but it doesn't in any way vitiate the reality of the factual basis for the initial inventory decision." (R. 330, Evid. Hr'g Tr., PageID 3041–42).

Lastly, though officers must follow "standardized procedure" when conducting an inventory search, the law allows for "flexibility and practical judgment in how such searches are carried out." *Hockenberry*, 730 F.3d at 661. The fact that they did not inventory all items is not dispositive. *Id.* Nor is it problematic that they started the inventory search at the scene, but then thought better of it and decided to complete the search at the tow yard. Tpr. Guild explained that "…there was a lot of stuff going on. There was people trying to leave with things. There was

people gathered at the scene, so we decided it would be better if we towed the vehicle. . . to finish our inventory." (R. 330, Evid. Hr'g Tr., PageID 2794). These observations are reasonable and fit within the flexibility and practical judgment we expect of officers on the scene.

Here, it is not "clear from the evidence" that the troopers were "act[ing] in bad faith or for the sole purpose of investigation," and their conduct and statements fall short of the more substantial evidence of alleged pretext in *Snoddy*. 976 F.3d at 635 (noting that the trooper repeatedly asked the appellant for consent to search before calling a tow truck, said that he would "try to search" the car when backup arrived, and "was going to find [contraband] either way"). Considering the evidence as a whole, "we are not left with the definite and firm conviction that the district court erred in finding that the inventory search was objectively justifiable." *Id.* at 636. Thus, we see no reason to disturb the district court's denial of Ferguson's motion to suppress evidence from the traffic stop on April 18, 2020.

As a concluding matter, Ferguson also argues that the troopers failed to prove probable cause for the April 18, 2020, search because he suggests the evidence (e.g., the receipts he displayed) and his conduct (e.g., traveling out of state to purchase goods) were not unlawful. We need not address this issue because we conclude that the search was proper under the inventory search exception. *Bertine*, 479 U.S. at 371 (holding that probable cause is not required for an inventory search).

*March 28, 2021, Stop.* Ferguson also argues that the district court should have suppressed evidence from the March 28, 2021, traffic stop because (1) law enforcement lacked probable cause to stop his vehicle; and (2) what probable cause did exist for the March 28, 2021, search derived from evidence obtained during the unlawful April 18, 2020, search and must be excluded as fruit

of the poisonous tree. He also contends that the inevitable discovery doctrine did not preclude application of the exclusionary rule.

As an initial matter, Ferguson challenges the existence of probable cause for the March 28, 2021, traffic stop. This argument fails. Police officers may lawfully stop a vehicle when they have "probable cause to believe that a traffic violation has occurred," *Hockenberry*, 730 F.3d at 658 (quoting *Whren*, 517 U.S. at 810), "regardless of the officer's subjective motivation for the stop," *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) (citing *Whren*, 517 U.S. at 812–13). Consequently, "[a] driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent." *Hockenberry*, 730 F.3d at 658 (quoting *Jackson*, 682 F.3d at 453).

Our de novo review reveals that there was ample evidence to establish probable cause. Two different law enforcement officers observed Ferguson make lane violations. SA Glynn saw the first lane violation around mile marker 16 on I-94 when Ferguson's vehicle veered between lanes—failing "to maintain its own lane." (R. 330, Evid. Hr'g Tr., PageID 2935). And Det. Frucci saw Ferguson's van change lanes twice without signaling in violation of Michigan's vehicle code. *See* Mich. Comp. Laws 257.642(1)(a). And Trp. Adams pulled Ferguson over based on Det. Frucci's calling out the lane violations over the radio. It is well established that a police officer's personal observation of a traffic violation is sufficient to establish probable case for a stop. *Whren*, 517 U.S. at 810 (citing *Prouse*, 440 U.S. at 659). Moreover, observations made by one officer and communicated to another or others who effectuate the stop are permissible pursuant to the collective-knowledge doctrine. *Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019). Thus, officers had probable cause to stop Ferguson's vehicle.

*March 28, 2021, Search.* Ferguson contends that the FBI did not have probable cause to search the Pacifica. The Fourth Amendment imposes a "per se requirement" that police officers obtain a warrant prior to conducting a search. *United States v. Galaviz*, 645 F.3d 347, 354–55 (6th Cir. 2011) (quoting *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). The automobile exception, however, allows officers to search a vehicle without a warrant if they have "probable cause to believe that the vehicle contains evidence of a crime." *Smith*, 510 F.3d at 647 (citations omitted). A police officer has probable cause to conduct a search when the "facts available to [the officer] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (brackets in original) (quoting *Florida v. Harris*, 568 U.S. 237, 243 (2013)). Probable cause "deals with probabilities and depends on the totality of the circumstances." *D.C. v. Wesby*, 583 U.S. 48, 57 (2018). "Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

Here, reviewing the "totality of the circumstances," the officers had sufficient probable cause to search Ferguson's vehicle. As the district court accurately observed, the FBI developed independent probable cause for Ferguson's ongoing involvement in a multi-state retail-theft-and-fraud conspiracy through their "tour de force of independent investigation," which was "at most" prompted by officers getting Ferguson's identifying information from the April 2020 traffic stop. (R. 330, Evid. Hr'g Tr., PageID 3043 (listing how troopers obtained Ferguson's name, phone number, use of rental cars, and notice of the electronics prior to the inventory search)); *see also Keszthelyi*, 308 F.3d at 574. SA Glynn testified that the FBI was able use Ferguson's identifying information to develop comprehensive background on the retail-fraud scheme. Through its research, the FBI connected Ferguson to eighty police reports from various jurisdictions and

coordinated those reports with Walmart's separate ongoing investigation into Ferguson's activities.

On March 28, 2021, SA Glynn used location data obtained through a warrant search of one of Ferguson's cell phones to live track Ferguson in the area of South Bend, IN, travelling northbound on US 31. At around 8:30 pm, SA Glynn physically observed a 2020 light blue Chrysler Pacifica with Texas plates, traveling northbound on US 31. SA Glynn identified the Pacifica as the same vehicle in Walmart surveillance videos where Ferguson had committed multiple thefts and fraudulent activities as recently as the same day. And when Tpr. Adams stopped Ferguson for the various lane violations, he observed a large quantity of electronics in the back compartment of the van. When SA Glynn arrived on the scene, he asked and was granted consent to search by Ferguson. SA Glynn then conducted a pat down and felt what he understood from his experience to be a large wad of cash in Ferguson's pant pocket. Thus, the totality of the circumstances, the continuous phone and physical surveillance, the real-time tracking of thefts and fraud supplied by Walmart investigators, and the trove of electronics that Tpr. Adams observed in the van sufficiently established probable cause to search.

As a concluding matter, Ferguson argues that because the 2020 search was illegal and the 2021 search occurred due to evidence from the 2020 search, the district court erred in applying the inevitable discovery doctrine. As a result, Ferguson contends that the district court should have suppressed the evidence from the 2021 search pursuant to the exclusionary rule. However, because we determined that there were no Fourth Amendment violations for either traffic stop, we need not address the applicability of the inevitable discovery doctrine or the exclusionary rule.

*Substantive Reasonableness*. Ferguson maintains that the district court's application of a 2-level upward variance was substantively unreasonable because the district court incorrectly

stated Ferguson's criminal history score at sentencing. Although Ferguson asserts that the district court erred in recounting his criminal history score, he does not challenge the procedural reasonableness of his sentence since the purported discrepancy did not affect his criminal history category—he remained in the highest category of VI. When a defendant does not challenge the procedural reasonableness of his sentence, this court may "limit our reasonableness review" to whether the sentence was substantively reasonable. *United States v. Tate*, 516 F.3d 459, 470 (6th Cir. 2008). The "touchstone" of this court's substantive reasonableness review is "'whether the length of the sentence is reasonable in light of the § 3553(a) factors.'" *United States v. Gardner*, 32 F.4th 504, 530 (6th Cir. 2022) (quoting *Tate*, 516 F.3d at 469 (6th Cir. 2008)). In evaluating a defendant's challenge in this regard, we must "consider[ ] the totality of the circumstances." *United States v. Johnson*, 26 F.4th 726, 736 (6th Cir. 2022) (citing *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). This includes "the extent of any variance from the Guidelines range," *id.*, with no "presumption of unreasonableness" for outside-the-Guidelines sentences. *Bolds*, 511 F.3d at 581 (citing *Gall v. U.S.*, 552 U.S. 38, 51 (2007)). Nonetheless, we afford "due deference" to a district court's decision to vary from the Guidelines, *Gall*, 552 U.S. at 51, and typically review a district court's sentencing determinations for an abuse of discretion, *id.*

Here, the district court acted within its discretion when it sentenced Ferguson to a two-level upward variance and custodial term of 144 months. The recommended Guidelines range was 100 to 125 months, provided the district court sustained Ferguson's acceptance of responsibility objection. The parties have agreed that the district court, when sustaining this objection at sentencing, incorrectly stated that Ferguson's criminal history score was twenty-one points. While we have reason to question the accuracy of the parties' math,[3] we agree with their conclusion that

---

[3] Our review of Feguson's Presentence Report yields still a third sum of 20. (R. 302, PageID 2237).

any error did not change Ferguson's criminal history category of Category VI. *See* U.S.S.G. § 5A (2007).

More importantly, the extent of any misstatement of Ferguson's criminal history score at sentencing does not detract from its basis for varying upward—the scope and brazenness of Ferguson's theft and fraud scheme. When the district court discussed Ferguson's criminal history score, it stated that the score supported an upward variance because his points were "comfortably" above criminal history Category VI's threshold of thirteen points. Even accepting Ferguson's claim that the district court overstated his criminal history points, Ferguson's actual score is still "comfortably" above category VI's thirteen-point threshold. The error does not cut against the district court's reasoning for its upward variance.

Furthermore, the criminal history category was only partially responsible for Ferguson's variance. As mentioned, paramount in the district court's reasoning was its belief that the Guidelines did not capture the "dramatic" scope and brazenness of Ferguson's theft and fraud scheme. (R. 331, Sen't Hr. Tr., PageID 3139–40 (reasoning that the "bigger point" justifying the variance was that "the guidelines . . . don't fully capture th[e] scope of wrongdoing")). As the district court noted, Ferguson's retail fraud was a five-year, nationwide scheme involving "pretty much every interstate" in the country and at least 450 instances of thefts and fraudulent returns and activities. (*Id.* at 3136, 3139–40). The district court then contrasted Ferguson's retail scheme to a similar 2017 case involving thefts and fraudulent returns to underscore the severity and context of his actions. Despite Ferguson's promising a New Jersey judge in the 2017 case that he was "remorseful" and wanted to "turn his life around," the district court here determined Ferguson had not meaningfully changed his ways. (*Id.* at 3140). Ferguson's arguments do not address or challenge these statements and thus do not challenge the actual basis for the district court's

nineteen-month upward variance. Because we take no issue with the district court's assessment that Ferguson's conduct was "brazen" and the breadth of his retail fraud scheme was "astonishing," we hold that the district court did not abuse its discretion varying upwards and that Ferguson's sentence was substantively reasonable.

## IV.  CONCLUSION

For the reasons set forth above, we **AFFIRM**.